FRANCINE ROSS, individually and as executrix,[1] *vs.*
CONTINENTAL RESOURCES, INC., & another.[2]

No. 07-P-153.

Middlesex. March 10, 2008. - January 12, 2009.

Present: McHUGH, BROWN, & KATZMANN, JJ.

*Practice, Civil,* Appeal, Dismissal of appeal, Attorney's fees, Costs, Judg-
ment, Transcript of testimony. *Consumer Protection Act,* Unfair or decep-
tive act, Attorney's fees.

This court vacated a third amended judgment entered in a civil action, in
which the judge dismissed as untimely the defendant's motion to alter the
second amended judgment and awarded sanctions, attorney's fees, and
costs to the plaintiff, where one of the components of the motion (seeking
the reduction of an award of attorney's fees and sanctions to the plaintiff
that first appeared in the second judgment) was timely, and therefore, the
filing of the motion was not an unfair or deceptive practice meriting an ad-
ditional award of attorney's fees and sanctions. [506-507] BROWN, J.,
concurring.

This court vacated that portion of a second amended judgment entered in a
civil action that awarded the plaintiff additional costs and fees based on
the defendant's having filed a motion to vacate an earlier order dismissing
the defendant's appeal from the original judgment, where the motion was
not baseless; however, this court remanded the matter to permit consideration
whether the plaintiff was entitled to attorney's fees as a prevailing party
for its appellate efforts in a case brought pursuant to G. L. c. 93A. [507-509]
BROWN, J., concurring.

In a civil action, the judge erred in dismissing the defendant's appeal from the
judgment on the ground that the defendant had not been diligent in order-
ing transcripts, where the record did not support conclusions that the
defendant was responsible for the delay in arranging payment for the cost
of the transcripts, that the defendant failed to perform any request by the
clerk involving assembly of the record, or that the defendant was required
to cure any alleged noncompliance with the clerk's requests. [509-514]
BROWN, J., concurring.

In a civil action, the judge did not abuse her discretion in reducing the judg-
ment against the defendant [514] after properly finding that the defendant,
in pushing forward a claim that it had once written off while concealing

[1] Of the estate of Stanley Ross.
[2] Continental Leasing Co., Inc.

that it could not prove to a reasonable certainty any amount that the plaintiff owed, had committed unfair and deceptive debt collection practices in violation of G. L. c. 93A [514-515]; however, because in awarding attorney's fees under G. L. c. 93A, the judge failed to provide a statement of reasons illuminating her fact-finding process, this court remanded the matter for reconsideration of that award [515-516]. BROWN, J., concurring.


CIVIL ACTION commenced in the Superior Court Department on April 23, 2001.

The case was heard by *Elizabeth M. Fahey*, J., and posttrial motions were also heard by her.

*Paul S. Samson* for the defendants.

*Michael C. McLaughlin* for the plaintiff.

McHUGH, J. Through extraordinary effort, a dispute involving roughly $15,000 mushroomed into a judgment approximating $135,000, the foundation for which is spread upon a docket comprising fifteen single-spaced pages and a correspondingly voluminous record appendix. The papers filed in the Superior Court, where the case was tried, bubble with sulphurous acrimony that, though cooled somewhat, has spilled over to the papers filed here, threatening on occasion to obscure the essential questions the appeal presents. Those questions center on the appropriateness of the initial judgment and of the trial judge's serial modifications of that judgment. Our review of the record leads us to conclude that the judge was correct in some respects and incorrect in others. We therefore affirm in part and reverse in part.

1. *Background.* a. *The underlying dispute.* To understand the significant twists and turns that produced the appellate issues, it is necessary to discuss the substantive and procedural history of the case in a little more detail than is customary. The dispute originated in a commercial relationship that began in the 1980's. Stanley Ross (Stanley), one of the original plaintiffs, was then a principal in a company called Docunet Corporation (Docunet). Docunet leased computer equipment from the defendants, Continental Resources, Inc., and Continental Leasing Co., Inc. (collectively Continental).

In 1987, Docunet fell substantially behind on its lease payments, so Continental, Docunet, and Stanley entered into a new lease agreement restructuring Docunet's obligations. Stanley

personally guaranteed Docunet's performance under the new agreement, securing that guarantee with a second mortgage on the Ross home. Although Stanley owned the home as a tenant by the entirety with his wife, plaintiff Francine Ross (Francine), he did not tell Francine about the guarantee.

Docunet soon encountered serious financial problems and, as a result, failed to honor the obligations it had assumed under the new lease agreement. As a consequence, Docunet returned to Continental all the leased equipment and, in 1991, filed for reorganization under Chapter 11 of the Bankruptcy Code, listing Continental as a creditor to which it owed $7,500. The bankruptcy proceedings led to a fifty percent plan of reorganization. Although some creditors received payment under that plan, Continental was not among them.

Ultimately, the reorganization was unsuccessful, and in 1994, Docunet again filed for bankruptcy, this time under Chapter 7 of the Bankruptcy Code. Continental was aware of both bankruptcy actions but, believing that the debts were uncollectible, wrote them off in 1991 and made no contemporaneous effort to collect on Stanley's guarantee.

b. *Early stages of litigation.* In 1999, however, Continental apparently decided that it was worthwhile to pursue Stanley's guarantee and so began foreclosure proceedings against the Ross house in the Land Court, where it received a judgment under the Soldiers' and Sailors' Civil Relief Act of 1940, 50 U.S.C. App. § 510 (2000), authorizing entry and sale.[3] Negotiations between Continental and Stanley then ensued but ended without resolution. At some point between 1989 and the time it started the 1999 litigation, Continental had destroyed its Docunet billing records in the ordinary course of business. Summaries of at least some of those records, however, were available, albeit without any documentary support or backup.

By the summer of 2000, Stanley was suffering from cancer and he and Francine decided to sell their house. It was then that Francine first learned of Continental's second mortgage and the

---

[3]At most, a foreclosure would have given Continental a right to Stanley's interest in property that was wholly defeasible if, as actually happened here, Francine outlived Stanley. See *Coraccio* v. *Lowell Five Cents Sav. Bank*, 415 Mass. 145, 151-152 (1993).

impediment to a sale the mortgage posed.[4] More negotiations ensued, during which Francine and Stanley told Continental of Stanley's health problems.

The negotiations failed. Thereafter, Stanley and Francine brought an action against Continental in Superior Court seeking declaratory and injunctive relief to prevent foreclosure and damages for violation of G. L. c. 93A, breach of contract, fraud, interference with advantageous relations, "fraudulent inducement," and intentional infliction of emotional distress. Continental counterclaimed against Stanley on his guarantee of the Docunet/Continental agreement.

After initial skirmishes, the case was set for trial on an expedited basis. The parties then agreed that Continental would discharge its mortgage in return for creation of an escrow fund into which Stanley and Francine would place $50,000 to be held until entry of final judgment.

c. *Trial and decision.* Escrow agreement in place, the case was tried, jury-waived, before a judge of the Superior Court, who dismissed all of Stanley's and Francine's claims except their claim under G. L. c. 93A. With respect to that claim, the judge found that, although Continental asserted that Stanley owed approximately $15,000 in principal and approximately $17,000 in interest on the guarantee, Continental's own records were insufficient to prove that Stanley owed that or any other amount. In addition, the judge found that Continental never told Stanley or Francine about destruction of its records and resulting inability to provide any "backup" for its claim. Continental hid information about its record destruction from Stanley and Francine, the judge found, "in order to, and solely as a way to, leverage [Stanley's and Francine's] interest in selling their house into a willingness on [their] part . . . to pay money to Continental, even though it could not document or back up the actual monies owed" and even though it knew that Stanley "was suffering from cancer and that as a result of his illness, the Rosses intended to sell their home."

Insofar as Continental's counterclaim was concerned, however, the judge stated that she disbelieved Stanley's trial testi-

---

[4]By that time, the first mortgage was held by Francine's brother and presumably was no obstacle to a sale.

mony that Docunet had paid Continental everything Continental was owed. More specifically, she disbelieved Stanley's testimony that he, himself, had sent checks directly to Continental as well as his testimony that canceled checks confirming those payments had been destroyed by a basement flood that had left all other basement contents intact.

Based on the list of creditors Stanley filed in the 1991 bankruptcy proceedings, the judge found that Docunet owed Continental "at least" $7,500 and therefore ordered entry of judgment for Continental in that amount plus interest. With respect to Continental's violation of G. L. c. 93A, the judge determined that Stanley's and Francine's damages were the attorney's fees of $10,773.36 they had incurred defending against Continental's foreclosure efforts. Based on a finding that Continental's actions were knowing and wilful, she trebled those damages to $32,321.88 and awarded Stanley and Francine $57,696.31 in attorney's fees for prosecution of the c. 93A claim.

d. *The first judgment.* Stanley died a few days after the trial ended, and his estate was substituted as a plaintiff. Francine and the estate (collectively Francine) and Continental promptly filed motions for reconsideration of the order for entry of judgment, each focusing on components of the order that were adverse to their interests. Continental, arguing that it had received an insufficient damages award, supported its motion with an affidavit from its attorney that took aim at the reliability of Docunet's bankruptcy creditor list, which the judge had used as a basis for her damages award. In his affidavit, Continental's attorney said that he had never offered the list in evidence because it was "unreliable, unsupported, and false." Instead, counsel explained, he had simply used the list while cross-examining Stanley to impeach his testimony that all of Docunet's debts to Continental had been paid before the bankruptcy filing.

The judge denied Continental's motion for reconsideration but allowed Francine's motion, saying in part that, after reading the affidavit of Continental's counsel, she was "no longer satisfied that the $7,500 amount [she] initially credited has any credible factual basis." Continuing, she said that it was

"not disputed that, by the time of trial, Continental knew

of the absence of a credible factual basis for this $7500.00 debt at the time. When it asked this court to find facts #57 and #58[5] in its Amended and Supplemental Request for Findings of Fact, Continental then believed that the $7500.00 figure lacked a credible factual basis as Ross and Docunet's debt to them. I am no longer satisfied that Continental has met its burden of establishing the amount of money owed to them by Ross and Docunet. Accordingly, this court vacates so much of its July 15, 2002, [order for] Judgment as awarded Continental $7500.00 on Counts I and II of its Counterclaim. Judgment is to enter for Continental on Counts I and II of the Counterclaim in the amount of $1.00 plus interest since June 27, 1990."

e. *The September 20, 2005, orders dismissing Continental's appeal and requiring "expedited" transcripts.* Judgment pursuant to the order just quoted was entered on July 8, 2003, and Continental filed its notice of appeal three days later. About two weeks after that, on July 28, 2003, Continental filed a certificate stating that on July 15, 2003, it had ordered from the court reporters a transcript of all proceedings. We shall have more to say about that certificate, and the judge's treatment of it, later in our discussion. Of importance to the general narrative, though,

---

[5]Throughout the proceedings, the judge, urgently prodded by Francine's counsel, appears to have attached unduly sinister motivations to the manner in which Continental's attorney used the bankruptcy creditor list. Continental's counsel never introduced that list in evidence and, instead, consistently used it to impeach Stanley's testimony that Docunet had paid Continental everything it owed. In keeping with that approach, the two requested findings on which the judge focused appeared in a section of Continental's request entitled "[Stanley's] claims for credits." The first request in that section said, "54. There is no credible evidence to support [Stanley's] claim that Docunet paid Continental for all invoices outstanding in 1989." The two requests on which the judge focused, part of a series of requests supporting request 54, said simply:

"57. At the time that Docunet filed for bankruptcy in February 1991, it listed Continental as one of its twenty largest creditors, having a claim of $7,500.

"58. There was no evidence of any distributions being made to Continental as a result of Docunet's bankruptcy."

Nothing in the record suggests that the factual statements in those requests were untrue.

is that no events whatsoever are reflected on the docket for the two-year period after Continental filed its certificate.

Eventually, the apparent lack of progress in the case led Francine to write a letter to the trial judge bringing to her attention the case's stalled progress. The judge treated Francine's letter as a motion and conducted a series of hearings that culminated in two orders, both dated September 20, 2005, and both docketed on September 29, 2005. Because the hearings revealed that the court reporters had prepared no trial transcript, the first order required them to do so within ninety days. At Francine's request, the order also vacated the escrow agreement, thereby permitting the escrow agent to give Francine the more than $50,000 that that account held. The second order dismissed Continental's appeal on grounds that Continental had not been diligent about pursuing the transcripts from the reporters.

f. *The second judgment containing additional attorney's fees.* Continental promptly filed a notice of appeal from the September 20, 2005, orders.[6] On May 3, 2006, seven and one-half months later, Continental filed a motion to vacate the order dismissing its appeal, arguing that the delay in obtaining transcripts was the product of trial court institutional problems, not fault on its part. As evidence of the institutional problems, Continental observed that it had paid the reporters for the transcripts before entry of the judge's order requiring transcript production in ninety days, but six months later, no transcripts had yet materialized.[7]

Francine responded with a motion for sanctions and a motion to dismiss the appeal from the order dismissing the appeal. In

[6]The hearings that preceded entry of the September 20, 2005, orders took place on August 17, 2005; September 6, 2005; and September 9, 2005. After entry of the orders, Continental promptly ordered transcripts of those three hearings, and those transcripts were filed on May 15, 2006.

[7]In all, seven volumes of trial transcript were at issue. Four volumes were filed on January 24, 2007, and the remaining three were filed seriatim on February 1, 20, and 28, 2007. When the transcripts were filed, the parties were haggling over the extent to which they were properly a part of the record on appeal from the order dismissing Continental's appeal, Francine arguing that they were not and Continental arguing that they were because Francine maintained, among other things, that Continental's dismissed appeal was frivolous and, thus, that even an erroneous dismissal of that appeal caused no harm. The transcripts finally were docketed on May 2, 2007, after an order from a single justice of this court permitted their provisional inclusion as a part of the record of this case.

the former, she argued that Continental's motion to vacate contained no issue or argument Continental had not advanced earlier. In the latter, Francine asserted that Continental had not moved quickly enough to obtain the transcripts necessary to perfect their appeal from the order dismissing the appeal.

After the hearings,[8] the judge denied Continental's motion to vacate the dismissal order as well as Francine's motion to dismiss Continental's appeal from that same order. The judge allowed, however, Francine's motion for sanctions because, in her view, Continental had provided no new grounds for questioning the correctness of her order dismissing the appeal. Purporting to act under the authority of G. L. c. 231, § 6F,[9] and G. L. c. 93A, she also awarded Francine $40,890.03 in additional fees and costs, but she did not articulate the manner in which she calculated that award. An "amended judgment" incorporating the additional fees and costs was entered on September 28, 2006 (hereinafter referred to as the second judgment).

g. *The third judgment also containing additional attorney's fees.* Continental again appealed, filing a general notice of appeal from the second judgment and a notice of appeal to a single justice of this court pursuant to G. L. c. 231, § 6G, to the extent that the trial judge had purported to act pursuant to G. L. c. 231,

---

[8]The hearings were held on September 21 and 22, 2006. Continental promptly ordered transcripts of the hearings, one of which was filed on October 11, 2006, and the other of which was filed on October 18, 2006.

[9]General Laws c. 231, § 6F, provides in relevant part:

"Upon motion of any party in any civil action in which a finding, verdict, decision, award, order or judgment has been made by a judge . . . , the court may determine, after a hearing, as a separate and distinct finding, that all or substantially all of the claims, defenses, setoffs or counterclaims, whether of a factual, legal or mixed nature, made by any party who was represented by counsel during most or all of the proceeding, were wholly insubstantial, frivolous and not advanced in good faith. The court shall include in such finding the specific facts and reasons on which the finding is based.

"If such a finding is made with respect to a party's claims, the court shall award to each party against whom such claims were asserted an amount representing the reasonable counsel fees and other costs and expenses incurred in defending against such claims. . . .

"[T]he court shall specify in reasonable detail the method by which the amount of the award was computed and the calculation thereof."

§ 6F.[10] On October 4, 2006, however, Continental also served a motion to, inter alia, alter the second judgment by reducing or eliminating the new attorney's fees contained in the second judgment and by vacating the portion of the first judgment, entered four years earlier, that had reduced its recovery from $7,500 to one dollar. Continental accompanied its motion with documents from the United States Bankruptcy Court showing, it urged, that it had accurately represented the course of the bankruptcy proceeding throughout.

Francine again responded with a motion for sanctions, based partly on what she asserted was the untimeliness of Continental's motion and partly on Continental's appeal to the single justice, which she claimed was contrary to Continental's promise at various hearings to "move forward" with its appeal from the order dismissing the initial appeal. After hearing,[11] the judge ruled that Continental's motion was untimely and allowed, again under both G. L. c. 93A and G. L. c. 231, § 6F, Francine's motion for sanctions, this time adding $4,510 in fees and costs to the judgment. Once more, the judge did not accompany her award with an explanation of her calculation of the amount she awarded. Another "amended judgment" was entered on November 3, 2006, incorporating the added fees (hereinafter referred to as third judgment). As before, appeals by Continental to this court and to the single justice followed.

2. *Analysis and discussion.* Sensible unpacking of the appellate issues Continental has extracted from the tortured history just recited requires us to proceed chronologically from back to front, for early issues are moot unless later issues are resolved in Continental's favor. In functional order, therefore, the issues are these: (a) those raised by Continental's appeal from the third judgment, namely, whether the judge properly dismissed as untimely Continental's motion to alter the second judgment, properly imposed sanctions and fees on Continental for filing that motion, and properly calculated those fees and sanctions; (b) those raised by Continental's appeal from the second judg-

[10]For a description of the appellate path prescribed by G. L. c. 231, § 6G, see *Danger Records, Inc.* v. *Berger*, 444 Mass. 1, 8-13 (2005).

[11]The hearing was held on October 19, 2006. Continental ordered a transcript of the hearing, which was filed on October 27, 2006.

ment, namely, whether the judge properly denied Continental's May 3, 2006, motion to vacate the order dismissing the appeal, properly assessed sanctions and fees against Continental for filing that motion, and properly calculated the fees and sanctions; (c) those raised by the appeal from the judge's order dismissing Continental's appeal from the first judgment, namely, whether Continental failed to pursue transcripts with appropriate diligence; and (d) those raised by the first judgment, namely (i) whether the judge properly reduced Continental's judgment from $7,500 plus interest to one dollar plus interest, (ii) whether the judge properly found that Continental had committed unfair and deceptive debt collection practices, and (iii) whether the judge properly calculated attorney's fees. We turn, therefore, to those issues in that order.

a. *Continental's appeal from the third judgment.* As noted earlier in the narrative, the second judgment was entered on September 28, 2006. In that judgment, the judge increased the plaintiff's recovery by $40,890.03, or about forty-five percent, by adding additional attorney's fees under both G. L. 93A and G. L. c. 231, § 6F. Continental served its motion to alter that judgment on October 4, 2006, and, in the motion, also sought alteration of the first judgment, which had been entered on July 8, 2003, more than three years earlier. The judge denied Continental's motion as untimely and, without saying why, awarded Francine $4,510 in additional fees and sanctions. That award was embodied in the third judgment and is the only difference between the third and second judgments.

Continental's motion was not untimely and should not have been denied on that ground. The motion targeted the second judgment, which contained two components, one old and one new. The new component was the additional $40,890.03 in attorney's fees. The old component was the damages award contained in the three year old first judgment that had simply migrated without change into the second judgment. Insofar as Continental's motion sought alteration of the new component, the motion, served six days after the second judgment was entered, fell well within the time permitted by the applicable rule. See Mass.R.Civ.P 59(e), 365 Mass. 827 (1974).

We need not decide whether the motion was also timely as to

the judgment's old component,[12] because our conclusion that it was timely as to the new component is sufficient to resolve the single issue uniquely arising out of the third judgment, namely, whether it was an unfair and deceptive practice meriting an award of attorney's fees for Continental to file a motion seeking, in part, reduction of fees and sanctions that first appeared in the second judgment. We think it self-evident that filing a timely motion of arguable merit[13] to obtain relief from a judgment imposing significant adverse consequences is not an act G. L. c. 93A prohibits. Accordingly, the third judgment is vacated.[14]

b. *Continental's appeal from the second judgment.* Vacation of the third judgment means that the second judgment is the operative judgment in the case. The second judgment, like the third, contains an old and a new component. The old component is the award of damages, costs, and fees embodied in the first judgment. The new component was the award of $40,890.03 in additional costs and fees against Continental for filing a motion to vacate the judge's September 20, 2005, order dismissing Continental's appeal from the first judgment.

The judge's September 20, 2005, dismissal order was grounded on her conclusions that Continental had not acted with sufficient dispatch and diligence in ordering the transcripts necessary for the appeal. Continental's motion to vacate that order, filed on May 3, 2006, seven and one-half months after entry of

---

[12]No decided Massachusetts case discusses in any detail the circumstances in which entry of an amended judgment adding attorney's fees creates new deadlines for motions and appeals that focus on the underlying relief the amended judgment incorporates. The lively debate that once existed on that subject in Federal circles, see, e.g., *Crossman* v. *Maccoccio*, 792 F.2d 1, 4-7 (1st Cir. 1986), seems to have been resolved in *Budinich* v. *Becton Dickinson & Co.*, 486 U.S. 196, 202-203 (1988), where the United States Supreme Court said that "[c]ourts and litigants are best served by the bright-line rule, which accords with traditional understanding, that a decision on the merits is a 'final decision' for purposes of [appealability] whether or not there remains for adjudication a request for attorney's fees attributable to the case." Our resolution of the issue arising out the of third judgment in this case makes it unnecessary to determine whether the *Budinich* approach should be followed in Massachusetts.

[13]See the discussion in part 2.b, *infra.*

[14]The third judgment is also an order awarding the same $4,510 in attorney's fees as a sanction under G. L. c. 231, § 6F. The propriety of that award is pending before the single justice and has been stayed pending a decision in this appeal. While our decision here may foreshadow the result there, we have no power now to vacate the § 6F award.

the dismissal order, consisted of five pages plus some exhibits. In the exhibits, Continental summarized its efforts to obtain the transcripts, noted that the transcripts remained unavailable seven and one-half months after the judge entered an order requiring the court reporters to prepare them within ninety days, and pointed to an article in the February 27, 2006, issue of Massachusetts Lawyers Weekly detailing the difficulties many lawyers were having in obtaining timely delivery of trial transcripts and the steps court administrators were taking to remedy the problem.

By marginal notation after two days of hearings, during one of which the judge orally denied Continental's motion, the judge allowed Francine's motion for sanctions, finding that Continental "filed a baseless . . . motion as they provided no new or additional information as to the correctness of this court's [order dismissing the appeal]. This court determines that, for this reason, fees are appropriate under both c. 93A and c. 231, § 6F [in the amount of $40,890.03] . . . . This court finds that the time charges and rates and work done by the plaintiff's counsel to be fair and reasonable."

Continental's motion was not "baseless." Indeed, as the next section of this opinion reveals, see part 2.c, *infra*, we think the dismissal order was error. From the outset, Continental had argued, at least in part, that its transcript difficulties were due to court reporters' workloads and resulting inability to produce transcripts in anything resembling reasonable amounts of time, not to its lackadaisical approach to ordering transcripts and following up on their production. To amplify those arguments, Continental's May 3, 2006, motion invited the judge's attention to the fact that even her order for "expedited" transcript production had no apparent effect on the reporters' production effort. If the reporters failed to respond to the judge's command, Continental argued, how could it fairly be penalized for the reporters' failure to respond to its request?

While we think that the fee award cannot be justified on the ground that Continental's motion was "baseless," some part of that award may be justified on a ground discussed at the hearing but not mentioned in the judge's order, i.e., the appropriateness of awarding attorney's fees to a prevailing party in a case

brought under G. L. c. 93A for all trial and appellate efforts reasonably expended in bringing the claim to a final resolution. In *Yorke Mgmt.* v. *Castro,* 406 Mass. 17, 19 (1989), the Supreme Judicial Court said that a prevailing plaintiff was entitled to appellate attorney's fees in an action under G. L. c. 93A, § 9, because "statutory provisions for a 'reasonable attorney's fee' would ring hollow if it did not necessarily include a fee for the appeal." The court has taken the same approach to claims under G. L. c. 93A, § 11. See *Twin Fires Inv., LLC* v. *Morgan Stanley Dean Witter & Co.,* 445 Mass. 411, 432-433 (2005). See generally *Bonofiglio* v. *Commercial Union Ins. Co.,* 412 Mass. 612, 613 (1992). For the same reason, a prevailing party is entitled to a reasonable attorney's fee for all other trial court actions reasonably necessary to obtain a final judgment. Accordingly, some part of Francine's fee request may be appropriate on the theory that some of her attorney's actions were reasonably necessary to move the case toward a final judgment. The second judgment is, therefore, vacated, and on remand, the judge may consider Francine's fee request anew in light of the principles just articulated.[15]

c. *Allowance of the motion to dismiss the appeal from the original judgment.* The next question becomes whether the judge properly dismissed Continental's appeal from the first judgment because of her conclusion that Continental had not been diligent in ordering transcripts from the court reporters. For the following reasons, we think that order was error.

The original judgment was entered on July 8, 2003. On July 11, 2003, Continental filed its notice of appeal. Continental's counsel believed that a full transcript of the trial and related proceedings was necessary for the appeal. One court reporter,

---

[15]Again, the second judgment was both a judgment and an order awarding sanctions under G. L. c. 231, § 6F. Continental's appeal from the latter is pending before the single justice and has been stayed pending a decision in this appeal. Our ruling on the "baseless" issue may foreshadow the single justice's ruling on that appeal, but in the event that it does not, we note that the amount of the fee award has absolutely no relation to the effort Francine's attorney expended in resisting Continental's motion. Instead, the award provides reimbursement for the cost of virtually every action her attorney took between entry of the first judgment and entry of the second. If there are to be any sanctions under G. L. c. 231, § 6F, those sanctions should bear a reasonable relationship to the harm caused by the sanctioned conduct. See note 9, *supra.*

Robert Jacques, had recorded the testimony over the eight days of trial and another, John Lynch, had recorded a nonevidentiary hearing following the trial. Accordingly, on July 14, 2003, counsel contacted both reporters by telephone and discussed with them his need for transcripts. The next day, counsel sent a letter to Jacques saying that he was "writing to make arrangements to order the transcript of the trial." In the letter, he asked Jacques to contact him "to advise what deposit is required to arrange for preparation of the transcript." The same day, counsel sent a letter of similar tenor to Lynch. Two weeks later, on July 28, 2003, counsel filed a certificate in accordance with Mass.R.A.P. 9(c)(2)(ii), as amended, 437 Mass. 1602 (2002), saying that he had ordered transcripts from the reporters.

Counsel heard nothing from either reporter. Accordingly, a paralegal from his office telephoned them on January 9, 2004, and January 26, 2004, to inquire about the status of the transcripts. One of the reporters replied that he had a substantial "backlog . . . and that it would be some time before a transcript of this case would be prepared." On February 5, 2004, the paralegal followed up with a letter to Jacques in which she said, among other things, "[w]ould you kindly forward an invoice by telefax to my attention or contact me by telephone regarding the cost of [the transcript] as soon as possible so that I may send payment via [F]ederal [E]xpress." In a letter she sent the same day to Lynch, the paralegal said, "Please contact the undersigned at your earliest convenience to advise what is required in way of a deposit in order to begin the preparation of the transcript." The paralegal followed the letters with telephone calls on February 11 and 13, 2004.

Again, nothing happened, this time for about fifteen months. On May 16, 2005, another paralegal from counsel's office contacted someone at the Superior Court in Middlesex County, where the case had been tried, to determine whether anything could be done to expedite the trial transcript. He was directed to contact Jacques. This he did on May 26, 2005, and Jacques advised him "in general terms" of the transcript costs but said that "it would take multiple months for him to transcribe all of the proceedings requested." On May 31, 2005, the paralegal left a message for Jacques asking him to prepare the entire transcript.

Not until a telephone conversation on July 21, 2005, however, did Jacques inform the paralegal of the amount of the deposit required for preparation of the transcript ($5,400) and of the mailing address to which the deposit should be sent. The paralegal sent that deposit to Jacques four days later.

Meanwhile, Francine, without the knowledge of her attorney, sent a letter dated June 3, 2005, to the trial judge asking about the status of the record assembly.[16] The judge treated that letter as a motion to vacate the escrow account and expedite preparation of the transcripts. On September 2, 2005, Francine's attorney filed a motion to dismiss the appeal on grounds that Continental had not pursued transcript preparation with sufficient diligence.

The judge held hearings on the motions on September 6, 2005, and September 9, 2005, by which time counsel for Continental had been unable to learn anything from Jacques about the status of the transcript he had paid Jacques to prepare. Moreover, at that time counsel had not received from Lynch any information about the deposit Lynch required before he would begin preparing the transcript for which he was responsible.[17]

On September 20, 2005, the judge issued an order vacating the escrow account and ordering that the transcripts be prepared on an "expedite[d]" basis within ninety days. On the same day, she issued a memorandum and order dismissing the appeal. In her memorandum, the judge found that Continental's attorney had failed to comply with Mass.R.A.P. 8(b)(1), as amended, 430 Mass. 1603 (1999), which requires an appellant to "make satisfactory arrangements with the court reporter for payment of the cost of the transcript" at the time the transcript is ordered. Because counsel failed to make those arrangements, the judge concluded, counsel failed in an unspecified way to comply with Mass.R.A.P. 9(c)(2). Counsel's failure to comply with rule 9(c)(2), the judge also ruled, was the product of "inexcusable neglect" for which

[16]Francine's letter is actually dated May 23, 2005, but the judge used the June 3, 2005, date in her memorandum and order dated September 20, 2005, dismissing the appeal. Nothing turns on this discrepancy.

[17]After the September 9, 2005, hearing, counsel apparently received from Lynch the requisite information and, under letter dated September 12, 2005, provided Lynch with a requested deposit of $100 so Lynch could begin preparation of his portion of the transcript.

dismissal of the appeal was an appropriate remedy under the terms of Mass.R.A.P. 10(c), as amended, 417 Mass. 1602 (1994). As for the provision of Mass.R.A.P. 10(c) that states that "[i]f, prior to the lower court's hearing [a motion to dismiss the appeal] for noncompliance with Rule 9(c), the appellant shall have cured the noncompliance, the appellant's compliance shall be deemed timely," the judge said this:

> "By the date of the hearings on [the motion to dismiss], on September 6, 2005 and again on September 9, 2005, [Continental] had, only recently, made payment to Mr. Jacques for his portion of the transcript but had not received a copy of the transcript. By the dates of these two hearings, [Continental] had not yet made payment to Mr. Lynch for his portion of the transcript. Consequently this court concludes that the defendants had not fully cured their noncompliance as of the last hearing date, September 9, 2005."

One can surely understand the judge's frustration at the pace with which transcript preparation meandered toward an apparently indeterminate destination. She was correct in stating that "the principal function of Rule 9(c)(2) is to put the responsibility for expediting the appeal squarely on the appellant," quoting from *Mailer* v. *Mailer,* 387 Mass. 401, 407 (1982). Moreover, she correctly noted that the requirement to arrange payment found in rule 8(b)(1) is designed to ensure that an appellant's order of a transcript is not an empty gesture designed simply for delay.

At the same time, an appellant cannot make "satisfactory arrangements" for payment without knowledge of what payment is required. In this case, both reporters failed to respond to repeated requests for information about the required deposit for more than two years. When they finally did respond, counsel for Continental made the requisite payments immediately. On this record, therefore, we think the judge's conclusion that Continental violated Mass.R.A.P. 8(b)(1) was erroneous.

We also think that the judge's rulings with respect to Mass. R.A.P. 9(c) and with respect to the curative provisions of Mass. R.A.P. 10(c) were erroneous. With respect to the former, a violation of rule 8(b)(1) is not automatically a violation of Mass.

R.A.P. 9(c), as amended, 437 Mass. 1602 (2002). Rule 9(c) has only two components. Rule 9(c)(1) requires that the appellant perform, upon request by the clerk, acts "reasonably necessary to enable the clerk to assemble the record." See *Maurice Callahan & Sons, Inc.* v. *Outdoor Advertising Bd.*, 376 Mass. 135, 136 (1978); *Spivey* v. *Neitlich*, 59 Mass. App. Ct. 742, 745-746 (2003). Nothing in the record suggests that any clerk made any requests of anyone in this case. Rule 9(c)(2) requires an appellant who desires a transcript to deliver to the clerk either the transcript itself or a signed statement certifying that a transcript has been ordered from the reporter. As noted earlier, Continental filed the requisite certificate in timely fashion.[18]

Finally, insofar as rule 10(c) is concerned, the quoted passage from the judge's memorandum suggests that she thought Continental could only invoke the rule's "curative" provisions if it actually filed a transcript before the hearing on Francine's motion to dismiss. However, the "cure" of which rule 10(c) speaks is a cure of noncompliance with rule 9(c), and as just stated, compliance with rule 9(c) is achieved by doing what a clerk asks, by filing a transcript, *or* by filing a certificate that a transcript has been ordered. See *Russell* v. *McOwen-Hanelt*, 413 Mass. 106, 110 (1992), cert. denied, 506 U.S. 1051 (1993). As Continental had already completed the last of those three tasks, there was nothing to cure.

In the last analysis, although the burden is on the appellant to take all steps reasonably necessary to keep the appeal on track, the appellant cannot force a court reporter to do what the reporter is unable or unwilling to do. Indeed, this case shows that even after entry of a court order requiring Jacques and Lynch to produce the transcripts in ninety days, Lynch's transcript did not materialize for eight months and Jacques took nearly fifteen months to prepare his. See note 7, *supra*. Remedies for those kinds of systemic delays ultimately must come from the court,

---

[18]The judge ruled that the certificate was defective because counsel's letters to the reporters said that he would like to "make arrangements to order" a transcript, not that he "was" ordering a transcript. We think that reading parses the letters too fine. In context, the letters clearly ordered a transcript, and even if they did not, the follow-up letters from the paralegal in February, 2004, clearly did.

for they lie beyond any remedial powers the parties possess.[19] On this record, the appeal should not have been dismissed.

d. *The first judgment.* Finally, then, we arrive at the merits, where three principal issues are tendered for resolution: (i) whether the judge properly reduced Continental's judgment from $7,500 plus interest to one dollar plus interest; (ii) whether the judge properly found that Continental had committed unfair and deceptive debt collection practices; and (iii) whether the judge properly calculated attorney's fees. We think the answers to the first two of those questions are yes, and the answer to the third is no.

i. *Reduction of the judgment.* The judge initially awarded Continental $7,500 plus interest on its counterclaim. The award was based on a bankruptcy document in which Ross stated that Docunet owed Continental $7,500. Continental sought reconsideration of that award on grounds that the bankruptcy document, which Continental had not offered in evidence, was unreliable. Then followed some wrangling among the parties as to how accurate the bankruptcy document was and why. The wrangling led to the judge's review of the document and the setting in which it was filed. After that review, the judge stated that she was "no longer satisfied that the $7,500.00 amount [she] initially credited ha[d] any credible factual basis." At the time she reached that conclusion, no final judgment had entered and she was entitled to reconsider both the order she had entered and the weight she had given the bankruptcy document in fashioning that order. "Though there is no duty to reconsider a case, an issue, or a question of fact or law, once decided, the power to do so remains in the court until final judgment." *King* v. *Globe Newspaper Co.*, 400 Mass. 705, 707 (1987), cert. denied, 485 U.S. 940 and 485 U.S. 962 (1988), quoting from *Peterson* v. *Hopson*, 306 Mass. 597, 601 (1940). We discern no error in her revision.

ii. *Unfair and deceptive acts.* As noted, the essence of the

---

[19]Concerned about these issues, the Supreme Judicial Court appointed a committee to explore and make recommendations regarding these issues. After a period of exploration, the committee issued a report and a series of recommendations, many of which are now in various stages of implementation. See Report of the Study Committee on Trial Transcripts, http://www.mass.gov/courts/trialtransrep.pdf (last viewed January 8, 2009).

judge's findings regarding unfair and deceptive acts violative of G. L. c. 93A was that Continental, knowing that it could not prove the amount Stanley owed on his guarantee, commenced foreclosure proceedings "intentionally and solely to scare [Stanley] into paying money [and thereby] sought to profit through intimidation." Continental argues that the finding of a c. 93A violation was unwarranted because, although Continental's underlying business records showing the source of Stanley's debt had been destroyed, summary records showed the amount Stanley owed, and the judge disbelieved Stanley's testimony that he had paid it all.

Continental's view of the judge's findings unduly favors its own view of the case. The essence of the judge's findings is that Continental pushed forward a claim it had once written off, knowing, but concealing, that it could not prove to a reasonable certainty any amount Stanley owed, and thus was likely to recover only nominal damages, see *Spring* v. *Geriatric Authy. of Holyoke*, 394 Mass. 274, 290-291 (1985); *Our Lady of the Sea Corp.* v. *Borges*, 40 Mass. App. Ct. 484, 489 (1996); Restatement (Second) of Contracts §§ 236 comment a, 346(2) (1981), because Continental had destroyed material records documenting what it claimed Docunet owed. While concealing its destruction of the records, Continental continued to push its claim in the hope that it might collect more than it could prove because it knew Stanley had cancer and that, as a consequence, the Rosses were trying to sell their home. Conduct like that "has an extortionate quality [with a] rancid flavor of unfairness," *Atkinson* v. *Rosenthal*, 33 Mass. App. Ct. 219, 226 (1992), and warranted the judge's conclusion that the conduct violated G. L. c. 93A.

iii. *Attorney's fees.* General Laws c. 93A entitles the prevailing party to recover his or her attorney's fees. Those fees are to be determined by the so-called "lodestar" method, which focuses initially on fair market rate for the time reasonably spent in prosecuting the case. *Killeen* v. *Westban Hotel Venture, LP*, 69 Mass. App. Ct. 784, 790 (2007). In calculating the lodestar, no amount should be awarded for the time spent on unsuccessful claims unless that time was so inextricably intertwined with the time spent on successful claims that the two cannot be separated. *Id.* at 792.

Ross *v.* Continental Resources, Inc.

In this case, counsel for Francine sought a total of $63,674.75 in fees and $4,795.52 in costs, an amount covering the time he had spent "in defending the Plaintiffs in this lawsuit and pursuing the case against the Defendants." In other words, the fees he sought covered his entire effort in the case. Counsel accompanied his fee request with a three-page affidavit and twenty-seven pages of bills.

The judge awarded fees in the amount of $57,696.31, ninety percent of what counsel had requested, and did not award costs. She did not make any findings indicating how and why she made the award. She also dismissed on the merits seven of the eight counts of the plaintiffs' complaint, labeling one of them, a claim for fraudulent inducement, as "rather preposterous." The judge also repeatedly stated that she disbelieved testimony Stanley gave on the witness stand about his payments to Continental and rejected Stanley's claim that the amounts he owed Continental were capped by the liquidated damages provision of the settlement agreement.

The amount of a reasonable attorney's fee is a fact that should be supported by some statement of reasons illuminating the judge's fact-finding process. Particularly is that so when the judge manifestly rejected much of the case the plaintiffs had brought. Without a statement of reasons, neither the parties nor a reviewing court has any basis for determining whether the judge put to one side the claims on which the plaintiffs failed or declined to do so on the ground that the tight nexus between the successful and the unsuccessful claims made separation of fees impossible. In addition, where a judge disbelieves substantial portions of a prevailing party's case, the judge must consider whether the rejected portions of the case increased the over-all fees the prevailing party incurred, and, if it did, should remove the increased portion from the ultimate fee award.

3. *Conclusion.* The third judgment, entered on November 3, 2006, is vacated. The order of September 29, 2005, dismissing Continental's appeal is vacated. The attorney's fee awarded in the second judgment, entered on September 28, 2006, is vacated, and the case is remanded to the Superior Court for reconsideration of attorney's fees in accordance with the principles contained

in parts 2.b and 2.d.iii of this opinion. In all other respects, the second judgment is affirmed.

*So ordered.*

BROWN, J. (concurring). As I have noted before, the law often appears to aid the greedy more assiduously than it does the needy. See *Doliner* v. *Brown*, 21 Mass. App. Ct. 692, 698 (1986) (Brown, J., concurring in part and dissenting in part). This is another example in which a marginal claim of $15,000 spawned more than a decade of litigation — at times, both sides could see or should have perceived the futility of further efforts — and mushroomed into an award of over $100,000 in damages (an apparently problematical amount at this stage) and attorney's fees. In brief, the teaching point here is that a litigant in pursuit of $15,000 may well end up paying out over $100,000.[1] See *Cruz Mgmt. Co.* v. *Wideman*, 417 Mass. 771, 777 (1994). All this has been a huge waste of judicial time and resources, but I suspect the legal fees expended by the respective parties were perceived by the lawyers as beneficial.

A final comment (as I have also noted before): "There seems to be no shortage of attorneys who are prepared to litigate; however, attorneys who have the ability or inclination to engage in risk assessment and counsel their clients accordingly do seem to be in short supply. . . . Careful and sagacious counseling should act as a prophylactic so that an overreaching and obdurate [party], as here, does not run the risk of being 'hoist[ed] with his own petard.' William Shakespeare, Hamlet act 3, sc. 4." *Adams* v. *Peterson*, 35 Mass. App. Ct. 782, 782-783 (1994).

---

[1]The old nursery rhyme comes into play here: "For want of a nail the shoe was lost, For want of a shoe the horse was lost, For want of a horse the rider was lost, For want of a rider the battle was lost, For want of a battle the kingdom was lost, And all for the want of a horseshoe nail." Oxford Dictionary of Nursery Rhymes 324 (Iona & Peter Opie eds., 1951).